UNITED STATES DISTRICT COURT
EASTERN DISTRICT
SOUTHERN DIVISION


PEGGY MITCHELL,

      Plaintiff,

Case No. 09-10558

v.

Honorable Paul D. Borman
United States District Court


CIENA HEALTHCARE MANAGEMENT, INC.,
MCBAIN NURSING CENTER, LLC and
DAVID BOSLOOPER, individually,

      Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 33)

This matter is before the Court on Defendants Ciena Healthcare Management, Inc., McBain Nursing Center, LLC and David Boslooper's Motion for Summary Judgment. (Dkt. No. 33.) Plaintiff's filed a Response (Dkt. No. 36) and Defendants filed a Reply (Dkt. No. 37.) The Court heard oral arguments on Thursday, April 15, 2010. For the reasons that follow, the Court GRANTS Defendants' motion.

## I. BACKGROUND

Plaintiff, a former employee at the Autumnwood nursing home in McBain, Michigan, alleges in her Complaint that Defendants discriminated against her on the basis of her gender when they offered her a choice between a demotion or resignation. Plaintiff alleges that she rejected both options, and was discharged. Plaintiff claims that Defendants' decision to offer Plaintiff a transfer

was made two days after Defendant Boslooper, an avowed sexist, expressed his opinion that Plaintiff was an inferior employee because she was a woman and should be fired. Plaintiff claims that the decision to offer her a transfer (which Plaintiff argues was an adverse employment decision) was directly influenced by Defendant Boslooper's sexist remarks and therefore her discharge was based at least in part on Plaintiff's gender.

Defendants respond that Defendant Boslooper was not the decision maker regarding Plaintiff's transfer and that Plaintiff's steadily declining job performance, not her gender, was the basis for Plaintiff's supervisor's decision to offer Plaintiff a different position. Defendants also respond that Plaintiff was reassigned and did not suffer an adverse employment decision and cannot show that she was replaced by a male. Defendants further respond that Defendant Ciena was not Plaintiff's employer, that McBain and Ciena cannot be considered joint employers, and that therefore Defendant Ciena should be dismissed.

### A.     Plaintiff's Employment with McBain

Plaintiff began working as the Accounts Receivable/Resident Business Office Manager at McBain in January, 1977. (Pl.'s Resp. Ex. 1, Mitchell Dep., 30-32; Defs.'s Mot. Ex. E.) Plaintiff described her job duties as follows:

> Did accounts receivable, which was maintaining records for all monies coming into the facility, balancing bank statements with what I had posted in the computer, admission packet, putting all information in the computer for billing purposes and for medical purposes, insurance information. Everything on the resident when they came into the facility and went in to the computer I put it all in. I met with the family members. I did the admission packet. Got everything signed. I would do mail. When mail would come the administrator would go through it. Any checks for anything that came into that facility came to me; I posted them, I deposited them and I kept track of them.

(Defs.'s Mot. Ex. A, Mitchell Dep. 44-45; Defs.'s Mot. Exs. B, C.) Plaintiff testified that she was

responsible for billing private pay residents, but that Ciena was responsible for billing Medicare and Medicaid. (*Id.* at 45.) If private pay residents were not paying, Plaintiff was responsible for contacting the family to try to collect payment. (Defs.'s Mot. Ex. A, Mitchell Dep. 46.) If Plaintiff was having trouble with a particular private pay resident, she was to contact David Boslooper, the Ciena employee in charge of private pay collections who reported directly to Sandy Paynter. (*Id*; Defs.'s Mot. Ex. P, Echler Dep. 13.) Plaintiff was also responsible for managing the residents' trust funds, and disbursing funds upon a resident's request. (Defs.'s Mot. Ex. A, Mitchell Dep. 50.) Plaintiff was partially responsible for month-end closings, which she would run and overnight to Ciena for final close of the month billings. (*Id*. at 52.)

From 2001 to 2007, Plaintiff's immediate supervisor was Dan Echler, who was then the administrator of the McBain facility. (Defs.'s Mot. Ex. P, Echler Dep. 18.) Plaintiff received multiple pay raises during this period of time, most of which were recommended by Mr. Echler and approved by the CFO of Ciena. (Pl.'s Resp. Ex. 7.) Plaintiff also received many good performance evaluations. (Pl.'s Resp. Exs. 6-11.) On June 21, 2006, Ms. Paynter sent an email to Mr. Echler, who was still Plaintiff's administrator at the time, indicating that Ms. Paynter had been reviewing Plaintiff's job performance with the CFO of Ciena, Anis Kahn, and that Ciena wanted to be sure that Plaintiff received a pay increase to $15.50/hour to show appreciation for Plaintiff and to demonstrate their commitment to keeping her as a long term employee. (Pl.'s Resp. Ex. 8.) While most of Plaintiff's reviews during this time were very good, she was given a written warning in September, 2005 for failure to keep her administrator, Mr. Echler, apprised of problematic collection cases, "placing the facility in danger of not recovering payments timely." (Defs.'s Mot. Ex. E.)

In October, 2007, Mr. Echler became the Regional Director of Operations for Ciena,

employed directly by Ciena, and Shannon Reed replaced Mr. Echler as administrator at McBain. (Pl.'s Resp. Ex. 2, Deposition of Shannon Reed, October 23, 2009, p. 6; Pl.'s Resp. Ex. 3, Echler Dep. 9, 11.) Shortly after, Plaintiff began to experience some problems with her job performance. Ms. Reed, Plaintiff's immediate supervisor at McBain, testified that Plaintiff was not properly conducting initial intakes, not following up on families who stated that they were pursuing and filing Medicaid applications, not following up with the Michigan DHS on applications that were filed, and not keeping Ms. Reed and Ciena's accounts receivables department aware of what was happening with delinquent private pay files, all of which resulted in excessive aging in McBain's private accounts. (Defs.'s Mot. Ex. Q, Reed Dep. 36, 44-48, 56.) Ms. Reed testified that Plaintiff was warned in March or May, 2008, that if her account agings did not improve, disciplinary action was an option. (Defs.'s. Reply, Ex. AA, Reed Dep. 93-94.)

Mr. Echler, who was the Regional Director at the time of the decline in Plaintiff's performance, concurred with Ms. Reed and noted that Plaintiff was not handling the delinquent private pay accounts appropriately, which were in arrears close to $190,000.00 as of July, 2008. (Defs.'s Mot. Ex. K; Ex. A, Mitchell Dep. 133.) Mr. Echler also criticized Plaintiff because she was not pressing hard enough on the families to collect and she was not getting corporate (Ciena) involved as soon as it became apparent that there were problems. (Defs.'s Mot. Ex. P, Echler Dep. 49.) Mr. Echler testified that this amount of arrearage was dramatically out of line with other comparable facilities, whose arrears were typically under $25,000, and significantly higher than when he was the administrator at McBain. (*Id.* at 58-59.) Recognizing that this significant arrearage was the result of a few difficult cases, Mr. Echler stated that Plaintiff still should have taken corrective steps to get Ciena involved and to establish payees, through the court system if necessary,

long before the amounts escalated. (*Id.* at 49-50.) Plaintiff states that her agings historically were well within the normal range but admitted that, as a result of 4 difficult cases, she "temporarily deviated from the norm." (Pl.'s Resp. 3-5.)

Mr. Echler's general impression of Plaintiff was that she was on "the middle ground" in terms of her professionalism and was a little "rough around the edges." (Defs.'s Mot. Ex. P, Echler Dep. 18.) Mr. Echler testified that organization was not Plaintiff's strong suit and that he found her lazy, preferring to "gossip" and go "out back smoking" rather than do her job. (*Id.* at 56.) Mr. Echler had written Plaintiff up in 2005 for failure to keep corporate apprised of problem cases, and for putting the facility at risk of not recovering timely payment. (Defs.'s Mot. Ex. E.)

Plaintiff does not deny that there were significant private pay amounts in arrearage in July, 2008, but Plaintiff explains in great detail in her brief and her Affidavit that this was the result of 4 isolated, difficult cases. Plaintiff states that both Ms. Reed and Mr. Echler were aware of these cases by virtue of the monthly reports that were sent to Ciena which would have documented these cases and these amounts. (Pl.'s Resp. Ex. 4, Mitchell Aff. ¶¶ 19, 22-24.) Plaintiff also states in her deposition that problematic cases were really not her responsibility, but were the responsibility of Mr. Boslooper, collections manager for Ciena. (*Id.* ¶ 19.)

### B. Plaintiff's Dealings with Mr. Boslooper

Mr. Boslooper was the collections manager responsible for private collections at Ciena. (Pl.'s Resp. Ex. 3, Echler Dep. 13.) Mr. Boslooper is no longer employed by Ciena. (*Id.* at 13.) Mr. Boslooper's duties as collections manager included auditing the bookkeepers of the various facilities managed by Ciena, verifying that the facilities were following Ciena's policies and procedures on collections and securing guardianships and conservatorships from the court when necessary.

(Defs.'s Mot. Ex. S, Boslooper Dep. 10-13.)  McBain was one of the facilities over which Mr.

Boslooper had auditing responsibilities and Plaintiff, as the accounts receivable manager at McBain,

was under the auditing supervision of Mr. Boslooper.  Mr. Echler, as the regional director of

northern homes, was employed by Ciena, and was Mr. Boslooper's supervisor.  (Defs.'s Mot. Ex.

S, Boslooper Dep. 12.)

Plaintiff states that she first began to complain about Mr. Boslooper in October, 2007 when

he became angry with her because she would not come help him one day when he had car trouble

while on his way to McBain for a surprise audit.  Plaintiff claims that when she told Mr. Boslooper

that she couldn't come to help him, he told her she "better watch her back."  (Pl.'s Resp. Ex. 1,

Mitchell Dep. 89-90.)  Plaintiff reported this incident to Mr. Echler who told her not to worry about

it, he would handle it.  (*Id.*)  Plaintiff states that at a meeting at Ciena in May, 2008, attended by

Plaintiff, Ms. Reed, Mr. Boslooper, Ms. Paynter and Mr. Kahn, Mr. Boslooper attacked Plaintiff in

front of the group on the outstanding private collection amounts at McBain and accused her of not

doing her job.  (*Id*. at 91-92.)  Plaintiff stated that Mr. Kahn turned on Ms. Reed in the meeting and

blamed her for not watching over Plaintiff to make sure Plaintiff was doing her job correctly.  (*Id.*

92.)  Plaintiff also testified that at this meeting, or at another meeting at about this time, Mr.

Boslooper remarked that he needed to do something to get Plaintiff "off [her] fat ass to do [her] job

because all [she] did was sit with [her] thumbs up [her] ass."  (*Id.* at 87.)

Plaintiff states that her next encounter with Mr. Boslooper followed a hearing in court on

July 23, 2008 in Missaukee Probate Court.  (Defs.'s Mot. Ex A, Mitchell Dep. 65.)  Plaintiff was

in court on petitions for conservatorships for three of her aging accounts.  (*Id*.)  Mr. Boslooper

arrived late that day, after the hearing on the first petition had begun, because Ms. Reed had given

him inaccurate directions to the court. Mr. Boslooper became angry with Plaintiff, who had been present at the hearing with an attorney, and accused her of undermining him by accepting the Judge's recommendation that certain individuals be appointed as guardians for certain McBain residents. Apparently unbeknownst to Plaintiff, Mr. Boslooper had already made other guardianship arrangements for at least one of Plaintiff's aging accounts. (Pl.'s Resp. Ex. 1, Mitchell Dep. 68.) According to Plaintiff, following the hearing, during which Mr. Boslooper allegedly angered the judge with his aggressive behavior, Mr. Boslooper assailed Plaintiff for her conduct at the hearing, telling her "that's what he gets for thinking a woman could do this job. He should have known a woman wouldn't be able to handle this. What was he thinking thinking a woman could do this, and that he was going to recommend to [Mr. Kahn] that [Plaintiff] be terminated." (Pl.'s Resp. Ex. 1, Mitchell Dep. 65-72, 82.)

Plaintiff testified that after the hearing, back at McBain in a meeting with Plaintiff and Ms. Reed, Mr. Boslooper stated that he was going to recommend to Mr. Kahn that Plaintiff be fired. Plaintiff testified that Ms. Reed told Plaintiff to report the incident to Mr. Echler, which Plaintiff did in a phone call on her way home from work that day. Plaintiff testified that she told Mr. Echler that Mr. Boslooper had made comments about sending a woman to do the job. (*Id*. at 83-86.) Plaintiff never made a formal complaint about the events that transpired at probate court on July 23, 2008. (*Id*. at 88.)

Mr. Boslooper testified that "from 2003 up to 2007, [Plaintiff] was a good employee. Her audits were good. Her performance was good. She was doing a good job." (Pl.'s Resp. Ex. 13, Boslooper Dep. 29.) Mr. Boslooper testified that at the end of 2007 and the beginning of 2008, Plaintiff was "an emotional wreck" and "everything started going downhill at McBain." (*Id*. at 29-

30.) Plaintiff and her supervisor, Ms. Reed, attended a meeting with Ciena management prior to the July 23, 2008 Missaukee Probate Court hearings, during which Mr. Boslooper assured Ciena management that he would get the McBain agings under control: "And yes, I went on record with [Mr. Kahn] that I was going up to these hearings and that we will get it collected, okay, because that's the bottom line. He said okay. And he threw the aging and walked out. He was disgusted with everybody. He told everybody I'm disgusted. He looked at [Ms. Reed], he looked at [Plaintiff], me and [Ms. Paynter]. And he didn't say it to anybody in particular. He was just disgusted with everybody in the room on their aging at McBain." (Defs.'s Mot. Ex. S, Boslooper Dep. 98.) So, on July 23, 2008, Mr. Boslooper was attending the Missaukee Probate Court hearings with the specific directive to get the aging account problems at McBain under control. He was angry and upset that day because he felt that he had been misled by Plaintiff as to what was going to transpire at the hearings and he felt that "not one thing went correctly on what I needed to get done. . . . My whole objective was in the toilet. We didn't receive any money and we're still not straight on how we're going to solve these problems when I get back to tell [Ms. Paynter] and [Mr. Kahn]." (Pl.'s Resp. Ex. 13, Boslooper Dep. 85-86.)

Mr. Boslooper admitted that after the July 23, 2008 hearings, he met with Ms. Reed and told her that he was upset by Plaintiff's behavior in court that day. (Pl.'s Resp. Ex. 13, Deposition of David Boslooper, October 19, 2009, p. 86.) Ms. Reed recalled the meeting with Mr. Boslooper that day and testified that he was angry and swearing and told her that both she and Plaintiff should be fired for allowing the private collections to become so past due and that he had already talked to Mr. Echler about the situation. (Defs.'s Mot. Ex. Q, Reed Dep. 87-88) Ms. Reed testified that Mr. Boslooper accused both Ms. Reed and Plaintiff of undermining his authority. (*Id*. at 112.) Mr.

Boslooper also testified about his call to Mr. Echler to tell him what had happened, in which he indicated to Mr. Echler that he was frustrated with both Plaintiff and Ms. Reed and that they had accomplished nothing that day toward getting the aging accounts on track for collection.  (Pl.'s Resp. Ex. 1, Boslooper Dep. at 85-88.)  Mr. Boslooper testified that although he complained to Mr. Echler that day about Plaintiff, he did not recommend that Mr. Echler take any employment action against Plaintiff, nor could he because he is in no position to do so:

> Q: Yes. Let me interrupt you just a second. During this conversation did you recommend to Dan Eckler [sic] that he take any sort of employment action against Peggy?
>
> A: Oh, no. I'm not in that position to do that. I just reporting [sic] my findings. I don't have no chain of command in reference to Peggy Mitchell. She's hired by the administrator and she could be fired by the administrator
>
> People at Ciena, people at the Corporate Office we – for me, for my job I report to Sandy Paynter and Anis Kahn.     And I also informed the RDOs and the administrators on what my findings are.
>
> Q: But Shannon, I guess, would be the last word about the folks –
>
> A: Absolutely.
>
> Q: At Autumnwood.
>
> A: Absolutely.

(Pl.'s Resp. Ex. 13, Boslooper Dep. 89.)

Mr. Echler testified about the phone call he received from Mr. Boslooper that day and recalled that Mr. Boslooper was very unhappy with the results of the hearings and that Mr. Boslooper felt that both Ms. Reed and Ms. Mitchell had not done enough to get the appropriate persons appointed to get the aging accounts under control.  (Defs.'s Reply Ex. Y, Echler Dep. 34-39.)  Mr. Echler testified that he was similarly dissatisfied and frustrated with the outcome of the

collection efforts on the McBain agings and stated that the aging problem at McBain never should have gone on as long as it did, never should have been in court in the first place and should have had an established payee long before the court hearing transpired. (*Id*. at 39-40.) Mr. Echler stated that Ms. Reed also called him that day to inform him that Plaintiff and Mr. Boslooper "had words" at court that day, and that Mr. Boslooper had been "rude." (*Id*. at 35-36.) Mr. Echler did not recall anyone reporting any comments made by Mr. Boslooper regarding Plaintiff's gender. (*Id*. at 37-38.)

Ms. Paynter's recollection of the events surrounding the July 23, 2008 hearings, the details of which she had received from Ms. Reed, confirm the basic scenario described by Plaintiff, Mr. Echler and Mr. Boslooper:

> Q: Now, did you - did you hear that there had been a problem at - at those court hearings?
>
> A: I was told later that day after the court hearing that there had been a problem, that the judge had not allowed [Mr. Boslooper] to go into chambers.
>
> Q: Now, who told you that?
>
> A: I was told that by Shannon Reed.
>
> Q: Okay.
>
> A: And also [Mr. Boslooper] had called me on his way back from there, that a lot of the stuff had been decided before he even got there.
>
> Q: All right. What did - what did [Ms. Reed] tell you about that?
>
> A: Shannon more or less - Her information to me I guess was passed from Ms. Mitchell on. So more or less she said that [Mr. Boslooper] had been loud and obnoxious in the courtroom and that the judge would not allow him to go back into chambers and then in the afternoon would not allow him to come back in for the other hearing.
>
> Q: Anything else that Ms. Reed told you about that court hearing?
>
> A: No.

Q: What did [Mr. Boslooper] tell you?

A: David more or less told me that there had been a decision made in regards to [the aging account petitions] to allow the daughter's attorney to become the conservator, and that's not what had been discussed ahead of time or had been set up. So he was upset that that had been done, and he had not been made aware of those changes prior to him getting to court?

Q: Did he place responsibility for that with [Plaintiff]?

A: Yes.

(Defs.'s Mot. Ex. R, Paynter Dep. 46-47.) Plaintiff testified that she never filed a written report about the incidents that occurred on July 23, 2008. (Defs.'s Mot. Ex. A, Mitchell Dep. 88.) She also testified that this was the only time that Mr. Boslooper ever allegedly made a reference to her gender. (*Id*. at 93.)

Ms. Paynter, Mr. Boslooper's direct supervisor, testified that Mr. Boslooper could be "loud and pushy" and that there had been reports that he sometimes used foul language toward family members on collections visits, but that she never heard Mr. Boslooper make negative comments about women in general or about Plaintiff in specific. (*Id*. at 36, 40, 42.) Mr. Echler testified that Mr. Boslooper had a reputation for being rude, but that he was equally rude to both men and women and that he never had a complaint from Plaintiff about the way Mr. Boslooper treated women. (Defs.'s Mot. Ex. P, Echler Dep. 50-51.) Ms. Reed confirmed this perception of Mr. Boslooper, testifying that he was "rude and unprofessional across the board" and not in way specifically so towards women. (Defs.'s Mot. Ex Q, Reed Dep. 75-76.) Ms. Reed specifically testified that Plaintiff never mentioned to her that Mr. Boslooper made a comment to Plaintiff about sending a woman to do a man's job but that Mr. Boslooper had made that comment to Ms. Reed, when he was criticizing her [Ms. Reed] for her part in what had occurred at court on July 23, 2008. (*Id*. at 111.)

### C.     The Decision to Offer Plaintiff a Transfer

In March or April, 2008, Ms. Reed, Mr. Echler and Ms. Paynter began discussing the fact that Plaintiff "seemed to be overly stressed and that she was not operating as she had previously for the facility." (Defs.'s Mot. Ex. R, Paynter Dep. 44.) Sometime after the July 23, 2008 hearings, the decision was made to offer Plaintiff a transfer to a less stressful position with McBain. (*Id*. at 50.)

Mr. Echler was of the opinion that Plaintiff should be terminated: "I said fire her. [Ms. Reed] said I want to offer her another position in the facility. She had a couple of different positions she wanted to offer her. I said I don't think that that's a good idea. And I said it's your decision. You're the one that has to deal with her. I recommend you fire her. And [Ms. Reed] offered her another position, which my understanding is she turned down." (Defs.'s Mot. Ex. P, Echler Dep. 66-67.) Mr. Echler recalled that Plaintiff was offered two different positions - medical records and payroll. (*Id*. at 67.) Mr. Echler's understanding was that Plaintiff was going to be offered the same amount of pay regardless of the position she accepted and that her transfer was therefore a lateral. (*Id*. at 67-68.) There were no discussions about cutting Plaintiff's pay. (*Id*. at 68.) Mr. Echler stated that he had no further discussions with anyone about Plaintiff's transfer, that it was ultimately Ms. Reed's decision. (*Id*. at 68-69.) Mr. Echler stated that Ms. Reed called him on Monday to tell him that she had offered the positions to Plaintiff, told her to take the weekend to think about but that Plaintiff had refused the positions and opted to be terminated. (*Id*. at 69.) Mr. Echler testified that Plaintiff was replaced by a woman named Laurie, whose last name he could not recall. (*Id.*) Mr. Echler testified that the decision whether or not to terminate Plaintiff was be made by Ms. Reed, and was not be made by anyone at corporate (Ciena). (*Id*. at 64.)

Ms. Reed confirmed that Mr. Echler expressed his opinion that Plaintiff should be fired but

told Ms. Reed that it was her call. (Defs.'s Mot. Ex. Q, Reed Dep. 98-99.) Mr. Boslooper had also called Ms. Reed after the July 23, 2008 court hearings to inquire what was happening with Plaintiff. (*Id*. at 97-98.) Ms. Reed informed Mr. Boslooper that she was still discussing the situation with Mr. Echler and no decision had been made. Nothing more transpired in Ms. Reed's conversation with Mr. Boslooper that day and Ms. Reed had no further conversations with Mr. Boslooper prior to offering Plaintiff a transfer. (*Id*. at 97-98.)

Ms. Reed testified that she felt that Plaintiff was no longer effective in her position as accounts receivable manager but did not agree with Mr. Echler that Plaintiff should be fired. (*Id*. at 88.) Ms. Reed testified that Ms. Paynter was in agreement that Plaintiff should be retained in another capacity and that in fact Ms. Paynter had suggested offering Plaintiff another position within the company about a month or so earlier. (*Id*. at 99, 100-101.) Ms. Paynter testified that she recommended to both Mr. Echler and Ms. Reed, at different times, that Plaintiff be offered a less stressful position with the company and that she specifically discussed with Ms. Reed the possibility of offering Plaintiff the accounts payable position if possibly the person who then held that position, Laurie Prause, could handle Plaintiff's position as head of accounts receivable. (Defs.'s Mot. Ex. R, 50-51.) Ms. Paynter testified that whatever position they decided to offer Plaintiff would be at the same rate of pay and with the same seniority, just a switch of positions. (*Id*. at 52.) Ms. Paynter stated that while Mr. Boslooper had expressed his opinion prior to July 23, 2008 that Plaintiff should be fired, "[Mr. Boslooper] doesn't have any authority in those decisions." (*Id*. at 53.)

Ms. Reed decided to offer Plaintiff the employee business manager (accounts payable) position and spoke to Laurie Prause, who occupied that position at the time, to see if Ms. Prause would be willing to take on Plaintiff's job position so Ms. Reed could offer Plaintiff Ms. Prause's

position. (Defs.'s Mot. Ex. T, Affidavit of Lorrie Prause ¶¶ 2-4.) Ms. Prause agreed and Plaintiff called Mr. Echler to get his approval to offer Plaintiff either Ms. Prause's position or the position of medical records/central supply. (*Id*. at 99-101.) On July 25, 2008, Ms. Reed spoke with Plaintiff and explained to her that she had spoken with Mr. Echler and that they did not feel Plaintiff could handle her accounts receivable position any longer. She offered Plaintiff the position of payroll bookkeeper (Ms. Prause's position) at the same rate of pay she currently had and also offered her the position of medical records, also a department head position, but possibly at a lower rate of pay. (*Id*. at 101-102.) She told Plaintiff that she needed an answer by Monday (it was Friday when they spoke). (*Id*. at 102-104.) Ms. Reed documented her conversation with Plaintiff in a note to Plaintiff's personnel file. (Defs.'s Mot. Ex. L; Ex. Q, Reed Dep. 103.) Plaintiff denies that she was ever offered the position of accounts payable. (Defs.'s Mot. Ex A, Mitchell Dep. 103.) She testified that Ms. Reed offered her the option of resigning or taking the position of medical records supply at a pay cut. (Pl.'s Resp. Ex. 1, Mitchell Dep. at 97.) Ms. Reed confirmed that the person then in the position of medical records director (Dana Manchester) made less than Plaintiff but that it was not necessarily a given that if Plaintiff opted for that position, her pay would be cut. (Defs.'s Mot. Ex. Q, Reed Dep. 117.) Indeed, Ms. Reed testified that a pay cut might apply to that position. She testified though that she positively offered Plaintiff both the accounts payable and the medical records positions. (*Id*.) Ms. Manchester confirmed that Ms. Reed was going to offer the accounts payable job to Plaintiff. Ms. Manchester testified that Ms. Prause called her to "give her a head's up" that Ms. Reed was going to offer Ms. Prause's job (accounts payable) to Plaintiff, but that if Plaintiff didn't take it, Ms. Manchester (medical records) might want to consider applying for it. (Defs.'s Mot. Ex. U, Deposition of Dana Manchester, October 23, 2009, p. 6.) Plaintiff called Ms.

Reed on Saturday and told her that she did not want to accept a new position and she was quitting. (*Id.* at 102.) Ms. Prause did take over Plaintiff's position as accounts receivable manager. (Defs.'s Mot. Ex. T, Prause Aff. ¶ 6.)

### D.     The Relationship Between McBain and Ciena

Defendant McBain operates a long-term care facility (nursing home) called Autumnwood of McBain. Defendant Ciena contracts with McBain to provide certain management services. The relationship between McBain and Ciena is set forth in a "Management Agreement' which describes the obligations of Ciena in connection with management of the Autumnwood facility. (Defs.'s Mot. Ex. W.) The Management Agreement states that Ciena shall act as an agent and on behalf of McBain in performing all listed services including: payroll; obtaining and maintaining insurance; implementing and maintaining accounting systems; instituting and amending when necessary general salary scales, personnel policies and employee benefits; recommending a schedule of charges for services and materials and for collection of accounts receivable and moneys owed to McBain; administering, processing and collecting all Medicare and Medicaid accounts receivable; purchasing food, beverage, medical, cleaning and other supplies necessary for the operation and maintenance of the facility; providing for the payment of accounts payable, employment costs, taxes, insurance premiums and other financial obligations of McBain; instituting standards for charging patients for services and for collecting charges from patients or third parties; handling and settling employee relation matters, union and non-union, including bargaining and negotiating on behalf of McBain; filing Medicare and Medicaid budget reports and rate increase requests; providing loans to McBain; providing suggestions and recommendations regarding provision of care to McBain residents, except that all quality assurance and care delivery authority rest solely with McBain;

contracting with contractors for provision of services; recruiting and presenting professional and administrative candidates to McBain, coordinating all legal matters and proceedings relating to McBain; and managing the employment of the administrator of McBain.

Employees of Defendant McBain are given the "Autumnwood of McBain Employee Handbook," which sets forth the Autumnwood McBain Mission Statement, which pertains to Defendant McBain and does not mention Defendant Ciena. (Defs.'s Mot. Ex. H.) The Employee Handbook states that all employees are employed by McBain "at will" and that their employment with McBain is for no definite duration. (*Id.* at 5.) The Employee Handbook states that McBain prefers to fill vacancies from withing its ranks, and that employees should feel free to apply for transfers. However, the Employee Handbook states, such transfers must be approved by "corporate." (*Id*. at 20.)

The Employee Handbook does not generally reference Defendant Ciena except that under the heading of Employee Problem Resolution, Ciena is listed as the ultimate decisionmaker on employee complaints, which are evaluated by Ciena under the Ciena Corporate Compliance Program. The Test for Corporate Integrity Agreement, completed by McBain employees, explains the details of the Ciena Corporate Compliance Program, informing potential employees that if their facility administrator cannot resolve any employee concerns, the employee can request that the concern be addressed, and treated in a confidential manner, by the Ciena Complaint Resolution Program. (Pl.'s Resp. Ex. 18, p. 6.)

The Affidavit of Sandy Paynter, the Accounts Receivable Director for Ciena, explains that Ciena does not have any ownership interest in McBain and contracts with McBain to provide management services including obtaining regulatory compliance and provision of accounting and

legal services.  (Defs.'s Mot. Ex. G, Affidavit of Sandy Paynter ¶¶ 1-3.)  Ms. Paynter states that Ciena is not involved in the day to day operations of McBain, and that this responsibility lies with the McBain administrator and onsite management team.  (*Id*. ¶ 4.)  Ms. Paynter further states that Ciena did not employ Plaintiff in this matter, Peggy Mitchell, had no authority to hire, fire or discipline Ms. Mitchell and did not recommend that Ms. Mitchell be terminated.  (*Id*. ¶¶ 5-7.)  Ms. Paynter explains that Ciena does not set the salaries for McBain employees but does insure that wages for McBain employees are in line with industry standards and that Ciena offers it customers, like McBain, the opportunity to participate in a 401(k) Plan but that the customer is responsible for fund matching.  (*Id*. ¶ 8-9.)

Plaintiff states that Ciena was responsible for authorizing pay increases, as evidenced by Plaintiff's Payroll Change Notices, some of which were approved by Ciena.  (Pl.'s Resp. Ex. 7; Defs.'s Mot. Ex. P, Deposition of Daniel Echler, October 12, 2009, 11-12.)  Mr. Echler testified in his deposition that Ms. Paynter had input on the acceptance or denial of pay increases recommended by the administrator at McBain.  (Defs.'s Mot. Ex. P, Echler Dep. 19-20.)  Mr. Echler explained that while the facilities set the wage level, and the facility administrator can recommend a pay change, the regional director of operations must approve any change and ultimately, Anis Kahn, the Chief Financial Officer of Ciena, decides whether or not to adopt the pay increase.  (*Id*. at 18-20; Defs.'s Mot. Ex. A, Deposition of Peggy Mitchell, August 11, 2009, p. 38.)  Finally, Ms. Paynter explains that while Ciena does not provide insurance benefits to McBain employees, Ciena processes the payments for benefits through its provision of payroll services, but leaves selection and arrangement of particular benefits to McBain.  (Defs.'s Mot. Ex. G, Paynter Aff. ¶ 10.)  The McBain Employee Handbook also states that benefits, insurance and the 401(k) are provided by the "facility."  (Pl.'s

Resp. Ex. 5, p. 25-28.)  Mr. Echler explained it somewhat differently in his deposition, where he stated that Ciena provides a 401(k) and matches to employees and also provides employees with health insurance benefits at a cost to employees and with paid time off and holiday pay.  (Defs.'s Mot. Ex. P, Echler Dep. 21.)

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely,

where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III.    ANALYSIS

Plaintiff claims that she was discriminated against on the basis of her gender in violation of Title VII and the ELCRA. Title VII renders it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ELCRA also makes it unlawful for an employer to discriminate against an employee or prospective employee on the basis of gender. See M.C.L.A. § 37.2202(1)(a). Claims of discrimination brought pursuant to the ELCRA

are analyzed under the same evidentiary framework as claims of discrimination brought under Title VII. *See In Re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007); *see also Agnew v. BASF Corp.*, 286 F.3d 307, 309 (6th Cir. 2002) (citing *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 568 N.W.2d 64, 67-68 (1997)).

### A.      Direct Evidence of Discrimination

"Under both Title VII and Michigan law, a plaintiff may set forth a *prima facie* case of employment discrimination by presenting direct evidence of the defendant's discriminatory intent." *Hopson v. Daimler Chrysler* Corp., 306 F.3d 427, 433 (6th Cir. 2002) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion)); *Harrison v. Olde Fin. Corp.*, 225 Mich.App. 601, 572 N.W.2d 679, 683 (Mich.Ct.App.1997) (holding that, when the plaintiff presents direct evidence of discrimination, federal law provides appropriate guidance for analyzing claims brought under the Michigan Civil Rights Act)). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999) (citations omitted). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003).

To constitute direct evidence of discrimination, statements must be made by the employer and discriminatory remarks are only attributable to the employer when they are made by a decision maker. The Sixth Circuit has held that "comments made by individuals who are not involved in the

decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir.2003). In *Hopson, supra,* the court held that comments made by plaintiff's manager, giving his opinion that race was a factor in the company's decision to deny plaintiff a promotion, were not direct evidence of discrimination where the manager admitted he had no involvement in the decision-making process. 306 F.3d at 433. *See also McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) (recognizing the holdings of the Sixth Circuit that "a statement made by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official" and finding that blatant age-related remarks made by plaintiff's immediate supervisor could not be imputed to the ultimate decision maker, who disregarded prior recommendations to terminate plaintiff and as to whom no evidence of discriminatory animus was alleged).

However, where otherwise isolated or ambiguous remarks are made by an individual with decision-making authority, such remarks can constitute direct evidence of discrimination. Plaintiff relies on *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004), where the court found that an individual who was plaintiff's direct supervisor, and who was solely responsible for evaluating plaintiff's performance during his probationary period, had sufficient decision-making authority that his discriminatory remarks were considered direct evidence of discrimination. Plaintiff's supervisor recommended plaintiff's termination during a meeting with management called specifically to discuss plaintiff's. *Id*. at 413, 416. The court found that the decision to terminate was made after a "thorough discussion" with plaintiff's supervisor. The court concluded that this demonstrated that plaintiff's supervisor had decision-making authority with respect to plaintiff's termination. *Id.* The court found that, therefore, the supervisor's alleged comments to plaintiff that he was "a dirty wop"

and that there were "too many 'dirty wops" working at the company, were direct evidence of discriminatory intent. *Id.* at 416.

Plaintiff also relies on *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 568, 572 (6th Cir. 2003), where the court found direct evidence of discriminatory intent where allegedly age-related remarks were made directly to plaintiff by the president and vice-president of the company, the individuals who then made and announced the decision to demote plaintiff. Plaintiff further relies on *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 531 (6th Cir. 2008) *abrogated on other grounds in Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009), where the court noted several indicia that strongly supported a finding that plaintiff's direct supervisor was substantially involved in hiring and firing people in plaintiff's position, including the facts that plaintiff's supervisor: (1) called himself the terminator; (2) threatened to fire salespeople; (3) participated in personnel decisions; and (4) claimed himself that he was authorized to terminate people. Importantly, the court found, the supervisor's superiors never denied the fact that plaintiff's supervisor had the authority to hire and fire. *Id.* at 531. In addition, plaintiff's supervisor was the individual who notified plaintiff that he was fired and who signed plaintiff's termination letter.

The sole basis for Plaintiff's claim of sex discrimination in the instant case is that on one occasion Mr. Boslooper made a comment to her about sending a woman to do a man's job and that Mr. Boslooper threatened that he would get Plaintiff fired for her inability to handle her job.[1] The unrebutted testimony, however, is that Mr. Boslooper had no authority to terminate Plaintiff's

---

[1] Plaintiff stated in her deposition that Mr. Kahn, the CFO of Ciena, also discriminated against her but she offers absolutely no evidence in support of this claim. There is no evidence that Mr. Kahn was involved in any way in the decision to terminate Plaintiff and Plaintiff has not pursued this claim.

employment with McBain. Mr. Boslooper, despite his alleged threats to Plaintiff, testified that he had no authority with respect to Plaintiff's employment, that Ms. Reed was solely authorized to terminate Plaintiff. Ms. Paynter and Mr. Echler unequivocally stated that no one from Ciena, including Mr. Boslooper, had the authority to terminate Plaintiff. The testimony uniformly supports the fact that Ms. Reed, the administrator at McBain, was solely responsible for the decision as to Plaintiff's employment. While Ms. Reed may have spoken with Ms. Paynter and Mr. Echler about Plaintiff's situation, she completely disregarded Mr. Echler's recommendation to fire Plaintiff and instead offered Plaintiff the option to stay on in a less stressful position. There is no evidence that Ms. Reed ever consulted Mr. Boslooper or sought his opinion, although he offered his unsolicited opinion that both Plaintiff and Ms. Reed should be fired. Obviously, Ms. Reed disregarded this advice as she did not decide to terminate Plaintiff, Ms. Reed is still employed by McBain and Mr. Boslooper is no longer employed by Ciena.

Unlike the supervisor in *DiCarlo*, *supra*, who was solely responsible for plaintiff's performance review and who met at length with the ultimate decisionmaker specifically about plaintiff's performance just before the decision was made to terminate, there is no evidence that Ms. Reed ever solicited, let alone heeded, Mr. Boslooper's advice. Moreover, there was a consensus of opinion among Ms. Reed, Mr. Echler and Ms. Paynter, none of whom has been accused of bearing any gender discriminatory animus toward Plaintiff, that Plaintiff had been failing to perform her responsibilities in the position of accounts receivable. Also, unlike the president and vice president of the company in *Wexler*, *supra*, who made the discriminatory remarks and who then were personally responsible for demoting plaintiff, there is no evidence that Mr. Boslooper had any authority with respect to Plaintiff's employment and indeed all of the evidence that has been

presented demonstrates that he has no such ultimate authority.  Finally, unlike the supervisor in *Blair, supra*, who did have involvement in hiring and firing, and whose superiors did not deny that he had such authority, all of Mr. Boslooper's superiors, and Mr. Boslooper himself, deny that he had such authority.  There is simply no direct evidence which, if believed, requires without inference the conclusion that Plaintiff's gender motivated the decision to offer her a transfer.

## B.    Circumstantial Evidence of Discrimination

By contrast to a case based on direct evidence, when a Plaintiff bases a discrimination claim on indirect evidence, which requires inference to reach the conclusion that the defendant discriminated against Plaintiff, the court applies the familiar *McDonnell Douglas*[2] burden-shifting framework.  "[T]he plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination.  The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Blair, supra* at 524 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (other internal citations omitted).

## 1.    Plaintiff's prima facie case.

To establish a prima facie case of discrimination under both Title VII and ELCRA, a plaintiff must show that (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person

---

[2]  *McDonnell Douglas v. Green*, 411 U.S. 792, 802-805 (1973).

outside of the protected class.   *Vincent v. Brewer Co*., 514 F.3d 489, 494 (6th Cir. 2007) (citing

*Peltier v. United States*, 388 F.3d 984, 987 (6th Cir.2004)).

Conceding the first element, Defendants argue that Plaintiff fails to satisfy the second

element, i.e. that she suffered an adverse employment decision.   Defendants rely on *Kocsis v. Multi-*

*Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) for the proposition that "reassignments without

salary or work hour changes do not ordinarily constitute adverse employment decisions in

employment discrimination claims."   In determining whether a particular reassignment was

materially adverse, the court should "consider such factors as a demotion evidenced by a decrease

in wages or salary, a less distinguished title, a material loss of benefits, significantly diminished

responsibilities, or other indices unique to the situation." *Smith v. Chrysler Fin. Corp.*, 101 F. Supp.

2d 534, 544 (E.D. Mich. 2000) (citing *Kocsis, supra* at 886).   An employee offered a change in

position "has the obligation to give it a try and [can] not speculate that the defendant was acting in

bad faith."   *Kocsis, supra* at 886 (citations omitted).   Further, the employee must "make a real

attempt to compare the two positions before she file[s] her discrimination charge."   *Id*. at 887.

The evidence overwhelmingly demonstrates that Ms. Reed offered Plaintiff both the position

of accounts payable and the position of director of medical records.   Although Plaintiff denies that

she was ever offered the accounts payable position, the testimony of Ms. Paynter, Ms. Reed, Ms.

Prause and Ms. Manchester all support Ms. Reed's assertion that she offered Plaintiff Ms. Prause's

position as head of accounts payable to Plaintiff, that Ms. Prause would take Plaintiff's position in

accounts receivable and, if Plaintiff declined the accounts payable position, Ms. Manchester would

take the accounts payable position.   The evidence is undisputed that, if Plaintiff had accepted the

accounts payable position, she would not have incurred an wage reduction.   Moreover, even if

Plaintiff had accepted the medical records position, a wage decrease was not automatic and, according to Ms. Paynter, regardless of the position that Plaintiff accepted, her wages and seniority would stay the same. The meeting with Plaintiff to discuss these transfer options occurred on Friday July 25, 2008 and Plaintiff decided the next day to decline the transfer and quit her job. Ms. Reed's testimony states that a transfer to the medical records position might result in a reduction in pay. (Defs.'s Mot. Ex. Q, Reed Dep. 117.) Even assuming, however, that Plaintiff suffered an adverse employment decision, her failure to demonstrate that she was replaced by someone outside the protected class, or that a similarly-situated male was treated more favorably than she is, as discussed below, fatal to her claim.

Defendants next contend that Plaintiff cannot establish the third element of a *prima facie* case, that she was qualified for the position of accounts receivable. The evidence presented on this issue demonstrates that the accounts payable at McBain were far in excess of the normally acceptable range of aging accounts and that Plaintiff had failed to perform this essential duty of her job. However, the Court need not decide this issue because there is absolutely no genuine issue of material fact as to the failure of the fourth element of Plaintiff's *prima facie* case. Plaintiff does not contest, and there is no evidence to contradict the fact, that Plaintiff was replaced by a woman, Laurie Prause. In addition, Dana Manchester and Mary Bowers, both females, were placed in the positions of medical records and accounts payable, respectively. Nor does Plaintiff present any evidence that similarly-situated male employees, i.e. those with agings in excess of $190,000, were treated more favorably than Plaintiff. There is a complete lack of direct or statistical evidence to support the fourth element of Plaintiff's *prima facie* case of sex discrimination.

Plaintiff attempts to build a case of sex discrimination on a stray, isolated remark of an

individual who was not a decision maker for her employer and was not shown to be influential in Ms. Reed's decision to offer Plaintiff a transfer. The Court is mindful that "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under the circumstances giving rise to an inference of unlawful discrimination." *Blair, supra* at 529 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The Court concludes that Plaintiff has not presented such evidence in this case.

## 2. Evidence of pretext

Even assuming *arguendo* that Plaintiff could establish a *prima facie* case of sex discrimination, she cannot demonstrate that Defendants' proffered reason for offering her a transfer, i.e. that she was failing in the essential purpose of her job which was to collect from private paying residents, was a pretext. "To evaluate whether a plaintiff has created a genuine issue of material fact that the defendant's proffered non-discriminatory reason did not actually motivate the defendant's challenged conduct, [the court will] examine the evidence the plaintiff produces to establish a *prima facie* case, evidence discrediting the defendant's proffered reason, as well as any additional evidence the plaintiff chooses to put forth." *Blair*, *supra* at 532. The weakness, indeed failure, of Plaintiff's *prima facie* case is discussed at length above and an analysis of Plaintiff's pretext argument further supports the conclusion that Plaintiff's transfer was not motivated in any way by discriminatory purpose related to her gender but was related to a widely-held dissatisfaction with Plaintiff's performance of her job.

Mr. Echler, as to whom no discriminatory animus is attributed, began documenting Plaintiff's failures to collect and to keep Ciena informed of problem cases as early as September of

2005.  (Defs.'s Mot. Ex. E.)  The problem continued to escalate until finally in May or June, 2008, meetings were held at Ciena specifically to address the agings problem at McBain and both Plaintiff and Ms. Reed were told that the issue had to be rectified.  Plaintiff admits that there was a substantial problem with the McBain agings, although she attempts to explain them away as a series of bad situations.  This does not alter the undisputed fact that the problem was serious and that Plaintiff was not able to get it under control.  Plaintiff has never claimed that Ms. Paynter, Ms. Reed or Mr. Echler, the people responsible for challenging Plaintiff's performance, ever discriminated against her based on her sex.

Plaintiff proffers, as evidence of Defendants' discrimination, the remark by Mr. Boslooper about sending a woman to do a man's job (a remark directed at both Ms. Reed and Plaintiff) and his threat that he would have her fired (a remark also directed at both Ms. Reed and Plaintiff).  As discussed at length above, Mr. Boslooper had no authority to have Plaintiff terminated or to influence that decision in any way.  Mr. Boslooper was never consulted in the decision to offer Plaintiff a different position at McBain and indeed his opinion that Plaintiff should be fired was obviously rejected by Ms. Reed, who alone made the decision to offer Plaintiff a transfer, also declining to accept the advice of Mr. Echler that Plaintiff be fired.  Every person who testified in this matter, including Mr. Boslooper himself, testified that Mr. Boslooper had no authority to terminate Plaintiff and had no input in Ms. Reed's decision to offer Plaintiff a transfer within the company. *See McDonald, supra* at 1162 (reasoning that where the allegedly discriminatory remarks of a supervisor cannot be attributed to the ultimate decision-maker, no evidence of pretext can be found).

Although a discriminatory remark made by one with no managerial authority over personnel decisions is not considered indicative of discrimination, *see McDonald, supra*, such remarks are not

categorically irrelevant. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Therefore, when evaluating the issue of pretext, the Court may consider discriminatory remarks made "by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate plaintiff." *Id.* Assuming that a reasonable jury could conclude that Mr. Boslooper, who was in charge of private collections for Ciena, was in a position, by virtue of his ability to opine on Plaintiff's job performance, to affect decisions relating to her employment status, this does not end the inquiry. The Court still must examine the nexus between the discriminatory remarks and the allegedly adverse employment decision. *Id.* at 355. For example, was the remark truly the isolated opinion of a third-party or was the comment one of many in a pattern of discriminatory remarks which may establish a "general discriminatory atmosphere" or a "cumulative managerial attitude" among the company's decision-makers. *Id.* at 356-357. There is no evidence, and one could not reasonably conclude, given the significant presence of women in the workforce at McBain, that Mr. Boslooper's remark was part of a larger culture of gender-related animus at the company or was anything other than a one-off ill-conceived remark of an individual with a reputation for being generally loud and rude to men and women alike.

"The determinative question is whether [Plaintiff] has submitted evidence that [Mr. Boslooper's] sexual animus was a cause of the [decision to transfer]." *Wilson, supra* at 946. Even if a jury were to believe that Mr. Boslooper made the comments to Plaintiff which she attributes to him, no reasonable juror could decide, in light of the substantial evidence to the contrary, that Ms. Reed's conclusion (and the consensus of Ciena management) that Plaintiff could no longer handle the accounts receivable position and Ms. Reed's ultimate decision to offer Plaintiff a transfer for this

reason, were instead somehow motivated by Mr. Boslooper's allegedly offensive remarks. Although Ms. Reed, Mr. Echler and Ms. Paynter may have concurred with Mr. Boslooper's opinion that Plaintiff was not performing the duties of her position, there is absolutely no evidence to suggest that their conclusions were in any way influenced by Mr. Boslooper's discriminatory remarks about Plaintiff's gender. Such a conclusion would require something beyond inference and more in the nature of rank speculation.[3]

## IV.    CONCLUSION

The Court GRANTS Defendants' Motion for Summary Judgment (Dkt. No. 33) and dismisses the case with prejudice.

IT IS SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 16, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 16, 2010.


S/Denise Goodine
Case Manager

---

[3] Because the Court concludes that there is no genuine issue of fact that Plaintiff was not discriminated against on the basis of her gender, it does not address the issue of whether Ciena and McBain are joint employers.